# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| BELINDA DOZIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 3:05-0323** |
| v. | ) | **Judge Nixon / Knowles** |
| | ) | |
| JO ANNE BARNHART, | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Pleadings. Docket Entry No. 15. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 17.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for DIB on September 18, 2002, alleging that she had been

1

disabled since March 6, 2002, due to back pain radiating into her legs, knee pain, and depression.[1] Docket Entry No. 15, Attachment ("TR"), TR 12-13. Plaintiff's application was denied both initially (TR 20-21) and upon reconsideration (TR 22-23). Plaintiff subsequently requested (TR 31-32) and received (TR 313-339) a hearing. Plaintiff's hearing was conducted on November 29, 2004, by Administrative Law Judge ("ALJ") William F. Taylor. TR 12, 313. Plaintiff, vocational expert ("VE"), Gordon Doss, Ph.D, and Plaintiff's husband, James Dozier, appeared and testified. TR 12, 313.

On December 10, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 9-18. Specifically, the ALJ made the following findings of fact:

1. The insured status requirements of the Act were met as of the alleged onset date.

2. No substantial gainful activity has been performed since the alleged onset date.

3. The claimant has "severe" impairments including: lumbar spinal disc disease and bilateral chondromalacia patella (status post an arthroscopic surgery on each knee).

4. No impairment or combination thereof meets or equals the disability criteria of an impairment listed at Appendix One to Subpart P, 20 CFR Part 404.

5. The subjective allegations of disability are not credible.

6. The claimant retains the residual functional capacity for a limited range of light work (lift/carry 20 pounds occasionally and 10 pound [sic] frequently; stand/walk for

---

[1]Plaintiff also filed an application for SSI on February 17, 2004. *See* TR 12. Because her "case was already at the hearing level pursuant to a timely request" when she filed her application for SSI, that application "was escalated to hearing." *Id.*

2

6 out of 8 hours; sit throughout a normal workday with a sit/stand option; inability to push/pull more than 32 pounds; occasionally engage in postural activities such as stooping and crouching; and inability to tolerate exposure to excessive vibration and hazards such as unprotected heights).

7.  The residual functional capacity precludes all past relevant work.

8.  The claimant is a younger individual.

9.  The claimant has a high school education.

10. The claimant has no transferable work skills.

11. If the claimant could perform the full range of light work, considering the vocational factors of age, education and work experience, a directed conclusion of "not disabled" would result under Rule 202. 21 of Appendix Two to Subpart P, 20 CFR Part 404.

12. Although nonexertional limitations preclude performance of the full range of light work, using the above-cited Rule as a framework for decision making, a significant number of jobs exist in the national economy which could be performed, considering the residual functional capacity and vocational factors.  Examples of such jobs include: counter clerk; general office clerk; receptionist; and information clerk.

13. The claimant has not been under a disability through the date of this decision.

TR 17-18.

On December 16, 2004, Plaintiff timely filed a request for review of the hearing decision.

TR 7.  On February 23, 2005, the Appeals Council issued a letter declining to review the case

(TR 4-6), thereby rendering the decision of the ALJ the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. §§ 405(g)

3

and 1383(c)(3).  If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to back pain radiating into her legs, knee pain, and depression.  TR 13.

On November 20, 1997, Dr. C.D. Nawathe's records indicate that Plaintiff was "healthy" and "physical activity no problem."  TR 139.

On October 12, 1998, progress notes from the Premier Medical Group indicate that Plaintiff was seen for musculoskeletal strain with symptoms of sore stomach and sharp pains across the back, and light duty for a week was recommended.[2]  TR 192.

On October 16, 1998, Plaintiff returned to the Premier Medical Group and underwent an x-ray, revealing L-5 sprain and lumbar sprain.[3]  TR 191.

On October 23, 1998, Plaintiff returned to the Premier Medical Group for a follow-up evaluation of her back pain and was seen by Dr. Sherley D. Sims.  TR 190.  Dr. Sims noted that Plaintiff reported that she had been rear-ended while driving on October 12, 1998, and had had "some" lumbar pain at the time that had "now resolved very well."  *Id.*  Dr. Sims further noted that Plaintiff reported that she was still experiencing "some very mild residual discomfort" in the back of the neck and "some transient tingling or numbness sensation" when placing her hands behind her head, but was in "no acute distress" and had a full range of motion.  *Id.*  Dr. Sims

---

[2] The signature of the physician is illegible.  TR 192.

[3] Other notes and the physician's signature are illegible.  TR 191.

4

advised Plaintiff to exercise, apply warm compresses to the area, and continue on light duty for three more days, after which she could return to full duties.  *Id.*  Dr. Sims noted that x-rays of Plaintiff's cervical spine were negative.  *Id.*

On February 9, 1999, Medical Examiner Douglas Sims, PAC, examined Plaintiff and recommended DOT recertification.  TR 187.

On August 17, 2000, Plaintiff visited Dr. Nawathe for a physical examination.  TR 138. Dr. Nawathe indicated that Plaintiff reported that she had experienced three years of pain in the right cervical LM, as well as back pain, tingling in the arms, and numbness in the legs after an "accident at work."  *Id.*

In early September, 2000, Plaintiff returned to Dr. Nawathe for a follow-up examination.[4] TR 137.  Dr. Nawathe prescribed Celexa and reported that Plaintiff needed referral to a chiropractor.  *Id.*

On September 21, 2000, Plaintiff went to Dr. Nawathe for a pelvic exam and physical exam of the right "LM."[5]  TR 136.  Also on September 21, 2000, Plaintiff had blood taken for laboratory testing by Quest Diagnostics.[6]  TR 143-145.  All results were within normal range. *Id.*

On September 26, 2000, Dr. Nawathe referred Plaintiff to Dr. Ledbetter for a right "LNE biopsy."  TR 136.

On September 28, 2000, Plaintiff sought a referral from Dr. Nawathe to see chiropractor

---

[4] The first digit of the date is 0, but the second digit is illegible.  TR 138.

[5] The handwritten notes are generally illegible.  TR 136.

[6] The record does not reveal who ordered or conducted the tests.  TR 143-145.

5

Dr. James Davis for leg and arm numbness, and Dr. Nawathe agreed. TR 136.

On January 9, 2001, Medical Examiner Anthony Bernui, PAC, examined Plaintiff and recommended DOT recertification. TR 184.

On September 5, 2001, Dr. Steve Barton of Gateway Health System ordered a Beta, HCG Qualitative, for Plaintiff, the results of which were negative. TR 142.

On January 16, 2002, Plaintiff was examined by Donald W. Huffman, M.D., of the Premier Medical Group, for complaints of back pain. TR 183. Dr. Huffman indicated that Plaintiff related that she had injured her back around January 9, 2002, when she was lifting a box weighing 60 pounds or more, that she had continued to work, that she had tried to treat herself using over-the-counter analgesics and resting on her day off, and that the pain had worsened over the next few days and "continue[d] to get worse." *Id.* Dr. Huffman noted that Plaintiff was in "no acute distress," but that she "appear[ed] uncomfortable," and had tender lumbar spine over the L4-L5 spinous process, tender bilateral paraspinous muscles, and spasms and pulling of the spine toward the right. *Id.* He recommended limiting lifting to15 pounds, no repetitive bending, alternating sitting and standing work, avoiding carrying more than 15 pounds, and not operating vehicles while taking medication, and he prescribed Naprosyn and Skelaxin. *Id.* Dr. Huffman also completed an Attending Physician's Report for the Department of Labor - Worker's Compensation Division, in which he stated that Plaintiff could resume light work. TR 182.

Plaintiff returned to the Premier Medical Group on January 18, 2002, for a follow-up examination for her lumbar strain, where she was seen by Physician Assistant Harlon R. Arnold. TR 180. The progress notes from this visit indicate that Plaintiff was "a little better," but had "some burning and pain." *Id.* Plaintiff was advised to stop taking Flexeril and continue light

6

duty.  *Id.*

On January 21, 2002, Mr. Arnold completed a form indicating that Plaintiff could return to work and participate in "modified duty," but could lift no more than 20 pounds, should avoid repetitive bending at the waist, "may work standing or sitting," should avoid carrying more than 20 pounds, and should avoid prolonged standing in one position.  TR 179.  He noted that she could slowly increase her activity, and that her medication was "changed to Flexeril."  *Id.*

On January 22, 2002, Plaintiff telephoned the Premier Medical Group to report that she could "not function" while taking her medication three times a day.  TR 180.  Plaintiff was advised to stop taking Flexeril, and was prescribed Soma.  *Id.*

On January 28, 2002, Plaintiff returned to the Premier Medical Group and saw Dr. Huffman for follow-up examination regarding her lumbar strain.  TR 178.  Progress notes indicate that she complained of continued pain, burning, tingling and numbness in the right foot that was worse when sitting, and tenderness in the L4/L5 sinuous processes and right sciatic notch.  *Id.*  Dr. Huffman noted "limited improvement" of the lumbar strain and advised Plaintiff to avoid lifting more than 20 pounds, avoid repetitive bending, crouching, crawling, or stooping, take Vioxx, and attend physical therapy for evaluation and treatment.  *Id.*  He rated her as physically able to participate in modified duty.  TR 177.

A clinician completed a Physical Therapy/Lumbar Evaluation regarding Plaintiff on February 7, 2002.[7]  TR 175.  The evaluation indicates that Plaintiff rated her pain on a scale of 0-10 as a 4 at best, a 6-7 on average, and a 9 at worst, in the morning.  *Id.*  It further indicates that Plaintiff experienced pain when sitting, bending, and lifting, and that the pain was worse with

_____

[7] The clinician's signature is illegible.  TR 175.

7

prolonged standing or being still.  *Id.*

Plaintiff returned to Dr. Huffman for another follow-up examination on February 14, 2002.  TR 176.  Progress notes indicate that Plaintiff reported that physical therapy "seem[ed] to be helping," but that she continued to have burning sensations and tenderness.  *Id.*  Dr. Huffman's treatment plan included "increase restrictions to lifting 30 pounds," "no repetitive bending," "no work sitting or standing," "avoid carrying more than 30 pounds," "continue physical therapy for one more week," and take Medrol Dosepak as directed.  *Id.*

On February 22, 2002, Plaintiff visited Dr. Nawathe for complaints of low back pain, neck pain, and right leg pain and numbness after an injury at work.  TR 133.  Plaintiff reported that she had become injured when she lifted a crate at work on January 9th and had seen a Workers' Compensation doctor, who had diagnosed a lumbar sprain and referred her to physical therapy.  *Id.*  Plaintiff complained of low back pain radiating down her legs and feet, which she reported were numb, and she stated that the pain was "worse now than before."  *Id.*  Dr. Nawathe recommended that Plaintiff undergo an MRI to check for disc bulging.  *Id.*

On February 25, 2002, Plaintiff saw Dr. Huffman for complaints of increased right leg "symptoms," numbness, and weakness; and tenderness in the L4-L5 spinous processes.  TR 173.  Dr. Huffman recommended an MRI of the lumbar spine.  *Id.*  He limited her to lifting and carrying no more than 10 pounds, to work sitting only, and to no repetitive bending at the waist.  TR 172.

On March 5, 2002, Plaintiff saw Dr. W. Cooper Beazley for her lower back injury.  TR 149.  Dr. Beazley noted that Plaintiff had been on Vioxx and a second anti-inflammatory that had not helped, that physical therapy had made her symptoms worse, and that she had been on

8

light duty, primarily sitting, which caused her "a lot of pain and discomfort." *Id.* Dr. Beazley reported that Plaintiff complained of having back pain "all the time," right hip and leg pain "occasionally," and "no significant" left leg pain. *Id.* Plaintiff's history chart indicated that she had had another back injury "several years ago," but that the effects were not permanent. *Id.* Dr. Beazley's examination revealed that Plaintiff was in "mild to moderate" pain generally, secondary to "lower back pain and right hip discomfort"; that her gait was antalgic on the right; that she was "tender in the right SI region down into the right posterior hip area"; that she had "no mass effect," "no significant swelling," and "no creptius"; that sensory and motor examinations were intact; that motion in the lower extremities was within normal limits and "painless"; that reflexes were 1+ and equal in the lower extremities; and that x-rays of the lower back showed sacralization of the L5 vertebral body on the right and a narrowed disc space at the L5 level. *Id.* Dr. Beazley recommended that she proceed with her scheduled MRI, prescribed Co-Gesic for pain, and wrote her work restrictions allowing her to sit, stand, and lie down as needed. *Id.*

On March 6, 2002, Dr. Scott D. Gray reported that an MRI of Plaintiff's lumbar spine indicated "mild lateral recess spinal stenosis bilaterally, L3-4, from disc bulge," "bilateral foraminal stenosis, multiple levels, worse at L3-4 from disc bulge," and "no disc herniation." TR 128.

On March 12, 2002, Plaintiff returned to Dr. Beazley for a follow-up examination regarding her sciatica. TR 148. Dr. Beazley noted the results of Plaintiff's MRI and recorded his impression of degenerative disc disease at the L4-5 levels with preexisting osteoarthritis of the facet joints. *Id.* He suggested that she increase her activity, and take a "light duty job where

she can be up and around." *Id.* Dr. Beazely opined that prolonged rest would not help and that Plaintiff was not a surgical candidate. *Id.* Dr. Beazely noted that Plaintiff was "not happy" with his opinion that she should return to light work and "get into her regular occupation as soon as she can tolerate this." *Id.*

On March 18, 2002, Plaintiff visited Dr. Nawathe for a follow-up examination regarding her back pain. TR 132. Plaintiff reported that her back pain was "no better," and that she had pain standing, sitting, and walking, but was "a little better." *Id.* Also on March 18, 2002, Dr. Barton of Gateway Health System ordered laboratory tests for Plaintiff. TR 140-141. A Beta, HCG Qualitative, indicated a negative result; a CBC/DIFF/PLT indicated results within normal range; a Screen indicated a negative result; and a routine urinalysis indicated normal results. *Id.*

On May 13, 2002, Plaintiff saw Dr. Nawathe for leg pain, back pain, and weakness. TR 130. Plaintiff reported that her back pain was the "same as before." *Id.*

On June 12, 2002, Plaintiff returned to Dr. Beazley for a follow-up examination regarding her sciatica. TR 148. Plaintiff indicated that she had been off work following a hysterectomy and she complained of "continual" back and right leg pain, which was "worse" when she sat or was still. *Id.* Plaintiff's examination revealed that her sensory and motor examinations were "grossly intact," her straight leg raise was negative bilaterally, her ankle and knee jerks were 1+ and hypoactive bilaterally, and her back mobility was 70% normal. *Id.* Dr. Beazley recommended that Plaintiff "try to pick up a job skill that requires less physical labor" and suggested that she get an Functional Capacity Evaluation ("FCE") to assess permanent restrictions on her. *Id.* He opined that she had reached maximum medical improvement. *Id.*

On June 18, 2002, Plaintiff underwent an FCE performed by David Davenport, PT, at

Physiotherapy Associates/Ergoplex.  TR 150-155.  Mr. Davenport reported that Plaintiff "did not demonstrate a full and consistent effort," as indicated by both objective data, such as her low cardiac response, and by subjective data within the evaluation.  TR 150.  Mr. Davenport noted that, as a result, the results of the FCE did not reflect the "actual levels" of work ability.  *Id.*  Mr. Davenport's FCE regarding Plaintiff indicated that she could occasionally lift 15 pounds, carry 20 pounds, and push/pull 90 pounds; and that she could sit and/or stand for 40-60 minutes per hour and walk for 20-40 minutes per hour.  TR 151.  Lumbar AROM testing showed Plaintiff's mean range of motion to be less than normal, but Mr. Davenport noted that the test was not valid because Plaintiff "resisted supine SLR."  TR 152.  Mr. Davenport measured Plaintiff's abdominal strength as 4-, her back extensor strength as 4, and her reflexes as 2+, and noted that light touch sensation was "reduced on the right except in the L4 dermatone."  *Id.*  Plaintiff's pain rating on a scale of 0-10 was 6 at the beginning and 10 at the end of the examination, but Mr. Davenport noted that this was not consistent with the degree of muscle guarding and postural deviation demonstrated.  TR 155.  Plaintiff recorded a score of 21 on the McGill Pain Questionnaire, where a score of 30 or greater indicates poor psychometrics; had positive scores on all categories for Waddell's Non-Organic Signs, suggesting the presence of non-organic problems; and had a score of 4 on the Ransford Body Drawing, where a score of 3 or more suggests poor psychometrics.  TR 154-155.

On October 1, 2002, Plaintiff saw Dr. Beazley for another follow-up examination regarding her sciatica and back pain.  TR 147.  Dr. Beazley noted that Plaintiff's main complaint was back pain, and that she also complained of "occasional pain" down the legs and "some pain" in both hips.  *Id.*  Dr. Beazely observed that Plaintiff had "no gross deficits sensory and motor-

11

wise," but that "mobility in the back [was] limited secondary to pain." *Id.* He prescribed non-steroidal pain medication, Bextra. *Id.*

Also on October 1, 2002, Dr. Beazley completed a Premier Medical Group Form evaluating Plaintiff's work restrictions, wherein he permanently restricted her to limited duties. TR 171. Dr. Beazley indicated that Plaintiff could lift/carry 15-20 pounds 5 times per hour, bend 10 times per day, never climb ladders, push/pull 32 pounds 5 times per hour, do "overhead work" of 15 pounds 5 times per hour, and lift 7.5 pounds 10 times per hour. *Id.*

On November 4, 2002, Plaintiff was evaluated, on her attorney's request, by Lloyd A. Walwyn, M.D.[8] TR 157-160. Plaintiff reported that her symptoms "interfere[d] with her ability to sleep, engage in sex, sit or stand; do housework or laundry or yard work; drive, run, or walk; or perform her job as a courier." TR 157. Dr. Walwyn observed Plaintiff to "appear comfortable" at rest, but in "pain" when performing movements involving her lower back. TR 157-158. Dr. Walwyn indicated that Plaintiff had 50 degrees of lumbosacral flexion, that twisting resulted in "severe" back pain, that her lumbar paraspinal muscles had guarding and spasm, that heel and toe walks were normal, that right straight leg raise was positive and produced some sciatica at 90 degrees, that Lasegue sign was positive on the right side, that deep tendon reflexes at the knees and ankles were normal, and that there were no sensory abnormalities of the lower extremities. TR 158. Dr. Walwyn indicated that Plaintiff had 6% whole body impairment and explained that Plaintiff's clinical history and examination findings qualified for DRE Lumbar Category II, suggesting 5-8% whole body impairment. *Id.*

With regard to Plaintiff's Residual Functional Capacity ("RFC"), Dr. Walwyn opined

---

[8] Dr. Walwyn did not sign the evaluation. TR 160.

that she retained the ability to lift and/or carry a maximum of 30 pounds, frequently lift and/or carry 15 pounds, stand and/or walk a total of less than about 6 hours, and push and/or pull with moderate limitation. TR 159. In addition, Dr. Walwyn indicated that Plaintiff could occasionally climb, balance, and stoop, but should never kneel, crouch, crawl, or twist. *Id*. He imposed an environmental restriction on heights and on lifting more than 30 pounds. TR 160.

Dr. Marshall S. Millman evaluated Plaintiff for Anesthesia-Pain Management on January 7, 2003. TR 202-204. The evaluation indicates that Plaintiff's chief complaint was "sharp and burning and constant" low back pain radiating to bilateral lower extremities, with "frequent shooting pains that are sharp and ache" in her legs. TR 202. Plaintiff stated that she had stopped working the previous November because Federal Express could not accommodate Dr. Beazley's work limitations, and she noted that her pain had made her "irritable and depressed." *Id*. On physical examination, Dr. Millman reported, *inter alia*, antalgic movements, tenderness over the bilateral sacroiliac joints, sacrum, and bilateral sciatic notches, normal cervical range of motion, and restricted lumbar range of motion. TR 203. Dr. Millman diagnosed lumbar degenerative disc disease, lumbar radiculopathy, lumbar facet syndrome, lumbar spondylosis, and lumbar foraminal stenosis. TR 204. Dr. Millman planned to treat Plaintiff with a series of lumbar epidural blocks, Baclofen, Pamelor, and Percocet 5. *Id*.

On January 13, 2003, Plaintiff was assessed by Dr. Donita Keown. TR 161-162. Dr. Keown noted that Plaintiff walked with a "slight" limp on the right, but could rise from a chair with "relative ease" and had "no overt problems" getting onto or off of the examining table. TR 161. Dr. Keown further reported "no evidence of spasm or trigger points" at the thoracolumbar column; dorsiflexion with guarding and suboptimal effort to 70 degrees; guarded right hip

13

movement with anterior flexion to 90 degrees, internal rotation to 40 degrees, external rotation to 45 degrees, and abduction to 40 degrees; and "no overt impairment with tandem walk or Romberg exam." *Id.* Dr. Keown opined that Plaintiff did not need an assistive device to walk. TR 162.

On January 21, 2003, Dr. George W. Bounds, Jr. completed an RFC Assessment (Physical) form regarding Plaintiff. TR 163-168. Dr. Bounds indicated that Plaintiff retained the ability to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push and/or pull without limitation. TR 164. He further indicated that Plaintiff could frequently kneel, crouch, or crawl; occasionally climb ramp/stairs, balance, and stoop; and never climb ladder/rope/scaffolds. TR 165. He assessed no manipulative, visual, communicative, or environmental limitations. TR 165-166.

On January 28, 2003, Plaintiff visited Dr. Millman at Anesthesia-Pain Management for her first lumbar epidural block. TR 200-201. Plaintiff reported reduction in her pain from 100% to 40% after 20 minutes of recovery, and she was discharged in stable condition. TR 201.

On February 11, 2003, Plaintiff returned to Dr. Millman for her next lumbar epidural injection. TR 198-199. Plaintiff reported that she had experienced 4 days of increased pain after the last epidural, and that her current level of pain was 80%. TR 198. After the injection and recovery, Plaintiff reported "no back [*sic*] in her back," but "minimal reduction" of pain in her lower extremities, and she was discharged in stable condition. TR 199.

On February 25, 2003, Plaintiff visited Dr. Millman for her next epidural block. TR 197. After the injection and recovery period, Plaintiff reported pain reduction to a "comfortable

level," and she was discharged in stable condition. *Id.*

On March 11, 2003, Plaintiff returned to Dr. Millman with complaints of recurrent pain after a "small fall." TR 195. Dr. Millman opined that Plaintiff's pain was coming from the SI joints, facets, sacrum, or coccyx, rather than from disc disease treatable by epidural blocks, and he changed his method of treatment to sacroiliac joint blocks. *Id.* After injection and recovery, Plaintiff reported no pain in her SI joints and buttocks, but pain from the middle of the sacrum and the coccyx. *Id.* Dr. Millman's diagnoses were "Coccyodynia," "Sacroiliitis [*sic*]," and "Myofascial pain." *Id.*

On March 28, 2003, Plaintiff visited Dr. Millman with complaints of "extreme pain" in the mid-sacrum after the last injection. TR 194. Dr. Millman administered trigger point injections, and after the injections and recovery, Plaintiff reported a 2/3 reduction in pain. *Id.*

On April 17, 2003, Plaintiff saw Dr. Jeffrey E. Hazlewood of Physical Medicine Specialists of Middle Tennessee, for lumbar pain. TR 263. Dr. Hazlewood recommended two weeks of physical therapy evaluation and treatment, a home exercise program, and back education three times a week. *Id.* The same day, Dr. Hazlewood completed an Employee Return to Work Slip, indicating that Plaintiff could return to work that day with restrictions.[9] TR 249.

Dr. Hazlewood also completed an Initial Evaluation of Plaintiff on April 17, 2003. TR 242-247. In that evaluation, Dr. Hazlewood noted that Plaintiff showed "a lot of pain behavior as well as generalized type symptoms," suffered from "a combination of soft tissue/myofascial pain as well as a component of pain behavior," and was "very distraught and emotional with her pain." TR 243. Dr. Hazlewood also noted that he did not anticipate more than 50-70%

_____

[9] The restrictions imposed are illegible. TR 249.

15

improvement in Plaintiff's pain, but when he told her that he "doubt[ed] seriously she will ever be completely pain free," she "became more and more upset and irate" and left in tears. TR 243-244. He further noted that he believed Plaintiff was at maximum medical improvement and was "just in a pain management situation." TR 244.

Dr. E. Pritchett completed a Disability Evaluation regarding Plaintiff on April 22, 2003. TR 205-207. Dr. Pritchett noted Plaintiff's report that her injury on January 9, 2002, had "never improved"; that she had tried injections, medications, and physical therapy "without relief"; that her physical problems were compounded by the emotional and financial impact; that she had recurrent feelings of worthlessness; that she felt isolated because she could not work; and that she was afraid to drive or be among people because she might forget where she was going or "be jarred." TR 205. Plaintiff reported taking an anti-depressant medication, Neurontin, Oxicotin, Amitryptiline, and Premarin. TR 205-206. Dr. Pritchett diagnosed depressive disorder at "moderate" psychiatric disability level, "mild-moderate" impaiment, ADL Class 2, Social Functioning Class 3, Concentration Class 3, and Adaptation Class 2. TR 207.

On April 23, 2003, Plaintiff initiated physical therapy with Elizabeth Holt, DPT, ATC, at Star Physical Therapy. TR 262. Ms. Holt's assessment of Plaintiff was low back pain with referred pain into bilateral lower extremities; limited lumber range of motion; limited tolerance to sleeping, ambulation, and all activities of daily living; poor posture and body mechanics; and need for a home exercise program. *Id.* She noted that Plaintiff's "rehab potential is poor." *Id.*

On May 5, 2003, Plaintiff visited Dr. Hazlewood for lumbar spine re-evaluation. TR 260. Plaintiff rated her pain at a level of 9 out of 10, and she reported difficulty with sitting, standing, household tasks, reaching, lifting, lying/sleeping, bending, walking, and rising from a

16

seated position.  *Id.*  Plaintiff's physical examination revealed moderate lumbar flexion, extension, and left side bending, with major loss of lumbar right side bending.  *Id.*  Dr. Hazlewood advised continuing physical therapy three times a week for three weeks.  *Id.*

On May 8, 2003, Plaintiff returned to Dr. Hazlewood for a follow-up examination.  TR 241.  Plaintiff again rated her pain as 9 out of 10, but reported that the Neurotonin, TENS unit, and physical therapy were helping.  *Id*.  Dr. Hazlewood increased Plaintiff's Neurotonin, recommended continuing physical therapy and Tylox, ordered a TENS unit for home use, advised walking "as much as possible," and mentioned prescribing Celexa for depression "in the future."  *Id.*

On May 12, 2003, Dr. Hazlewood signed a Certificate of Medical Necessity for rental of "TENS or NMS Unit Supplies, electrodes, battery, charger, lotion, protective wipes, etc."  TR 258.

On May 19, 2003, Dr. Celia M. Gulbenk completed an RFC Assessment (Physical) regarding Plaintiff.[10]  TR 208-215. Dr. Gulbenk indicated that Plaintiff retained the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently, to stand and/or walk about 6 hours in an 8-hour workday, to sit for about 6 hours in an 8-hour workday, and to push and/or pull without limitation.  TR 209.  Dr. Gulbenk further indicated that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl.  TR 210.  No manipulative, visual, communicative, or environmental limitations were established.  TR 211-212.

On May 23, 2003, James R. Hebda, Ph.D., completed a psychological evaluation with clinical interview and mental status examination of Plaintiff in conjunction with her application

---

[10] Dr. Gulbenk's handwritten notes are generally illegible.  TR 208-215.

17

for disability benefits. TR 216-220. Dr. Hebda indicated that Plaintiff's complaints included chronic back pain secondary to work-related injury and depression. TR 216. Dr. Hebda reported an "overall impression" that Plaintiff was "not significantly limited by either cognitive or emotional problems." TR 219. He diagnosed depressive disorder NOS and rated her current GAF at 58. TR 220.

On May 28, 2003, Physical Therapist Holt completed a progress report for Plaintiff, indicating that Plaintiff had attempted, but was unable, to ride a jet ski, but could do "some light housework." TR 256.

Plaintiff also visited Dr. Hazlewood for a follow-up examination on May 28, 2003. TR 238. Plaintiff reported that she was "improving," rated her pain as 7 out of 10, and felt that the physical therapy, medications, and TENS unit were helping. *Id.* On physical examination, Dr. Hazlewood noted that she was "essentially unchanged," although emotionally she was "definitely improved." *Id.* Dr. Hazlewood conducted Nerve Conduction and Needle Exam studies, finding that Plaintiff's bilateral lower extremities were normal, and that there was no electrodiagnostic evidence of a lumbosacral radiculopathy, focal peroneal or tibial neuropathy, generalized polyneuropathy, or lumbosacral plexopathy. TR 239-240.

On June 4, 2003, Victor A. Pestrak, Ph.D., completed a Psychiatric Review Technique form regarding Plaintiff. TR 221-233. Dr. Pestrak indicated that Plaintiff's medical disposition was "Impairment(s) Not Severe" and was based on 12.04 Affective Disorders, specifically Depressive Disorder, NOS. TR 221, 224. Dr. Pestrak further indicated Plaintiff's degree of functional limitation for her Restriction of Activities of Daily Living as None; her Difficulties in Maintaining Social Functioning as Mild; her Difficulties in Maintaining Concentration,

18

Persistence, or Pace as Mild; and her Episodes of Decompensation, Each of Extended Duration as None. TR 231. Dr. Pestrak noted that Plaintiff had "no significant impairment," that her physical problems with pain rather than her mental problems were emphasized, and that her activities of daily living were "no more than slightly restricted from any mental disorder." TR 233.

On June 16, 2003, Ms. Holt's progress notes indicate that Plaintiff had "progressed further" in range of motion and strength, but had "fallen back in last week." TR 253.

On June 17, 2003, Plaintiff returned to Dr. Hazlewood for another follow-up examination. TR 237. Plaintiff reported that she was still in "a good bit of pain," but was "definitely better" and was helped by the physical therapy, medications, and TENS unit. *Id.* Dr. Hazlewood noted that he wanted to try to wean her off some of the narcotics and to try a SI joint injection. *Id.* He recommended continuing her permanent work restrictions. *Id.*

On August 15, 2003, Plaintiff returned to Dr. Hazlewood for another follow-up examination. TR 236. Plaintiff reported that she was still in "significant pain at times," but was "better" and had been helped by the SI injection, TENS unit, and home exercise program. *Id.* Dr. Hazlewood noted that narcotics were necessary for Plaintiff to maintain quality of life and function, and had her sign a narcotic agreement. *Id.* He administered bilateral SI injections. *Id.*

On October 10, 2003, Plaintiff visited Dr. Hazlewood for a follow-up examination. TR 235. Plaintiff reported that Neurotonin was helping, although it also caused some memory loss and dizziness, that her pain went up to a 10 out of 10 when she tried going off the medication, and that she wanted another SI joint injection. *Id.* Dr. Hazlewood noted that she was "overall doing fairly well," and recommended continuing Lortab and Neurotonin. *Id.* He gave her a right

19

SI joint injection.  *Id.*

On December 5, 2003, Plaintiff returned to Dr. Hazlewood for a follow-up examination. TR 234.  Plaintiff reported that her pain had flared up to a 9 out of 10, that the SI joint injection had not helped, that the Lortab caused nausea but "helps some," and that she had pain "all over her body," "a lot of fatigue," "stabbing pain" in her feet, and "diffuse numbness and tingling" sometimes.  *Id.*  Dr. Hazlewood noted that fibromyalgia might explain why Plaintiff was not improving, advised continuing her pain medications, and prescribed Compazine for nausea.  *Id.*

On February 27, 2004, Plaintiff returned to Dr. Hazlewood for a follow-up examination. TR 305.  Plaintiff reported that she was "doing fairly well," rated her pain as 8 out of 10, and felt that the medications and the TENS unit helped.  *Id.*  Dr. Hazlewood's impression was diffuse low back pain and probable fibromyalgia, and he recommended continuing her medications.  *Id.*

On April 20, 2004, Dr. Michael West of Gateway Health System completed a Radiology Final Report on an MRI of Plaintiff's right knee.  TR 287.  Dr. West indicated that a small knee effusion was present, but Plaintiff was otherwise normal.  *Id.*

On May 21, 2004, Plaintiff went to Dr. Hazlewood for a follow-up examination.  TR 306. Plaintiff reported that she was "about the same," but that treatment was "making a difference" with her pain, which she rated as 7 out of 10.  *Id.*  Dr. Hazlewood's impression was chronic back pain and fibromyalgia, and he recommended continuing Plaintiff's medication regimen.  *Id.*

On June 7, 2004, Plaintiff visited Dr. Keith D. Starkweather for a follow-up examination regarding her bilateral knee chondromalacia.  TR 281.  Dr. Starkweather noted that he was going to try Hyalgan injections because Vioxx, Celebrex, and Bextra had given her no relief.  *Id.*

On June 11, 2004, Plaintiff returned to Dr. Hazlewood for another follow-up

examination. TR 308. Plaintiff reported waking up with "severe back pain" and "numbness and tingling" down the extremities bilaterally, and falling twice because of pain, which she rated as "15/10" and constant. *Id.* Dr. Hazlewood noted that she walked slowly with a cane, had difficulty standing up straight, and appeared to be "in definite pain." *Id.* His impression was a large disc herniation and some early cauda equina syndrome, and he recommended an MRI. TR 207-208.

Also on June 11, 2004, Plaintiff underwent an MRI Lumbar Spine Without Contrast at Premier Radiology, which revealed central disc protrusion with annual tear at L4-5 with mild central canal narrowing and an underlying diffuse disc bulge and bilateral facet degenerative change resulting in mild to moderate bilateral foraminal stenosis, central disc protrusion with annual tear at L3-4 resulting in mild central canal stenosis, minimal displacement of the right-sided L4 nerve root, underlying disc bulge and mild facet degenerative changes resulting in mild bilateral inferior foraminal narrowing, and hemi-sacralized L5 vertebral body on the right with a pseudoarthrosis between its lateral mass and S1 and sclerosis on the margins of this area. TR 297-298. Plaintiff also underwent lumbar spine radiographs, AP and lateral views, which revealed mild degenerative changes in the lower lumbar spine and hemisacralization of L5 on the right with pseudoarthrosis between it and S1. TR 296.

On June 22, 2004, Plaintiff returned to Dr. Hazlewood for a follow-up examination. TR 309. Plaintiff reported that her back was "somewhat better" and that she was "improved," but that her main problem now was joint pain, including the right knee and ankle, with pain rated at a 7 out of 10. *Id.* Dr. Hazlewood noted that Plaintiff was walking with a cane, was tender throughout the lumbar spine, in the ankles, and in the knees, and appeared to be in "some," but

21

not "significant," pain.  *Id.*  Dr. Hazlewood's impression was fibromyalgia and central disc protrusion, and he recommended blood work and continuing her medications.  *Id.*

On June 28, 2004, Dr. Starkweather reported that Plaintiff returned to him for a second Hyalgan injection in the right knee lateral compartment.  TR 280.

On July 1, 2004, Plaintiff returned to Dr. Starkweather for a follow-up examination regarding her knees.  TR 279.  Plaintiff reported that she was "having a lot of pain."  *Id.*  Dr. Starkweather recommended Mobic.  *Id.*

On July 6, 2004, Plaintiff returned to Dr. Starkweather for a third Hyalgan injection in the right knee medial compartment.  TR 278.  Dr. Starkweather indicated that Plaintiff had "not gotten significant relief" and that he would try her in hinged knee braces.  *Id.*

On July 13, 2004, Plaintiff returned to Dr. Starkweather for a follow-up knee examination.  TR 277.  Plaintiff reported "severe popping, catching, and pain" behind the kneecap, as well as burning and crepitus.  *Id.*  Dr. Starkweather recommended performing chondroplasties, although he noted that the MRI had not revealed chondromalacia.  *Id.*

On August 13, 2004, Dr. Hazlewood was out of the office and Plaintiff saw a nurse.[11]  TR 310.  Notes from the visit indicate that Plaintiff's pain was "bad today" and that she wanted to increase Neurotonin, but did not need Compazine.  *Id.*  On August 17, 2004, Dr. Hazlewood referred Plaintiff to the UMC Pain Center for an ESI procedure to be done on August 26.  TR 300.

On August 24, 2004, Plaintiff returned to Dr. Starkweather for a follow-up examination.  TR 276.  Plaintiff complained of bilateral ankle pain, and Dr. Starkweather ordered blood work.

---

[11] The record does not reveal the nurse's name.  TR 310.

*Id.*  On the same day, August 24, 2004, Quest Diagnositics collected samples from Plaintiff for laboratory testing.  TR 288-289.  All results were "in range" and "negative."  TR 288.  Also on August 24, 2004, Dr. Starkweather reported that he had taken x-rays of Plaintiff that showed no "significant arthritis."  TR 286.

On August 27, 2004, Plaintiff saw Dr. Hazlewood for a follow-up examination.  TR 312.  Plaintiff rated her pain as 7 to 8 out of 10, although it was "a little bit better" than it had been in the previous few weeks.  *Id.*  Dr. Hazlewood noted that Plaintiff's pain below the knee appeared "fairly mild," that she was "diffusely tender" throughout the lumbar spine, and that her low back pain was "worse than usual."  *Id.*  He recommended trying a fluoroscopy guided epidural steroid injection after her knee surgery.  *Id.*  On the same day, Dr. Hazlewood referred Plaintiff to the UMC Pain Center for an ESI procedure to be done September 30.  TR 301.

On September 3, 2004, Dr. Starkweather completed a Clarksville Surgery Center-Operative Report regarding Plaintiff.  TR 283-284.  He reported performing left and right knee arthroscopy with synovial plica excision and left and right knee arthroscopic lateral retinacular release, which Plaintiff tolerated well.  *Id.*

On September 9, 2004, Plaintiff returned to Dr. Starkweather for a follow-up examination regarding her bilateral knee chondromalacia.  TR 275.  Dr. Starkweather noted that Plaintiff's surgical wounds were clean and dry, and that Plaintiff would work on range of motion that week.  *Id.*

On September 15, 2004, Plaintiff again returned to Dr. Starkweather for another follow-up examination regarding her bilateral knee chondromalacia.  TR 274.  He noted that she was "doing well," but that she had "some trouble" with flexion and "a lot" of superolateral swelling

on the right knee. *Id.* He prescribed 4 weeks of exercises 2 to 3 times a week. TR 290.

On September 30, 2004, Dr. Starkweather completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form regarding Plaintiff. TR 270-273. Dr. Starkweather indicated that Plaintiff's ability to lift/carry was unaffected, that she could stand and/or walk less than 2 hours in an 8-hour workday, that she could sit about 6 hours in an 8-hour workday, and that she was limited in pushing/pulling in the lower extremities. TR 270-271. Dr. Starkweather further indicated that Plaintiff could frequently balance, occasionally climb and stoop, and should never kneel, crouch, or crawl. TR 271. He imposed no limitations on reaching, handling, fingering, feeling, seeing, hearing, speaking, temperature extremes, noise, dust, vibration, humidity/wetness, hazards, or "fumes, odors, chemicals, gases." TR 272-273.

Also on September 30, 2004, Dr. T. Scott Baker signed an Outpatient Procedure form indicating that Plaintiff had a lumbar epidural. TR 299. Plaintiff noted no new complaints at the time of discharge. TR 293-294.

On October 25, 2004, Dr. Hazlewood completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form regarding Plaintiff. TR 265-268. Dr. Hazlewood indicated that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, periodically alternate sitting and standing, and push and/or pull less than 32 pounds in the upper extremities. TR 265-266. Dr. Hazlewood further indicated that Plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop, occasionally reach, and handle, finger, and feel without limitation. TR 266-267. He imposed no limitations on seeing, hearing, speaking, temperature, noise, dust, humidity/wetness, or exposure to "fumes, odors, chemicals, gases," but imposed limitations on

24

exposure to heights and vibrations.  TR 267-268.

## **B.  Plaintiff's Testimony**

Plaintiff was born on December 22, 1970, and has a high school education.  TR 316-317.

The ALJ asked Plaintiff whether she had had any vocation or technical job training, and she

responded that she had been a diesel mechanic in the Army.  TR 317.  Plaintiff stated that she

had stopped driving about a year earlier because she was afraid that her legs would go to sleep

while she was driving, her back hurt when she drove any distance, and she was not supposed to

drive while on the medication she was taking.  TR 317-318.  The ALJ asked when Plaintiff had

last worked, and she responded that she thought it had been in February of 2002, at Fed Ex.  TR

318.  She stated that she had not been officially fired until November and had received

unemployment benefits.  TR 319.  She further stated that the last time she had worked as a driver

was the first part of January 2002, when she was injured.  *Id.*  She admitted that she had gotten

Workers Compensation, and that on the work history report she filed she had written that she

worked for Fed Ex from March 1997 to November 2002.  TR 319-320.  Plaintiff acknowledged

that she had received unemployment benefits for about 5 months.  TR 320.

Plaintiff's attorney then questioned her about her medical history.  TR 321.  Plaintiff

answered that she had not had any problems with fibromyalgia, pain, headaches, depressive

conditions, or knee trouble prior to her injury in 2002.  *Id.*  Plaintiff further stated that her

conditions had started with her low back injury.  TR 322.  She stated that her knee had begun to

be a problem about a year earlier, but "got really bad" the past spring, and that she had

undergone surgery on both knees in September.  TR 323.  Plaintiff also testified that Dr.

Hazlewood had diagnosed her with fibromyalgia, which she acknowledged involved "a lot of

pains and aches all over [her] body," as well as "spinal cord headaches." TR 324. Plaintiff further stated that she had experienced problems with depression. *Id.* She said that her medications had an intoxicating effect, which made it unsafe for her to drive or operate any heavy equipment, but that she could not function without them because of the pain. TR 324-325.

The attorney asked Plaintiff about her daily activities, and she responded that she could not sleep more than three hours comfortably on an average day, and that she sometimes took naps. TR 325. Describing a normal day, Plaintiff stated that her husband or mother-in-law did the cooking, her children did most of the laundry, her husband vacuumed, mopped and swept, she did some light dusting, and her children did the yard work. TR 326-327. She reported that she used to do it all herself before her injury. TR 327. She also stated that she could no longer take her children skating, jet skiing, biking, or playing basketball, and they could not go without her. TR 328. She stated that her condition also affected her marital relationship because sexual activity hurt "too much." *Id.*

Plaintiff reported that she could not perform any of the jobs that she had held in the past. TR 328. Plaintiff further stated that her family had suffered "great financial strain" without her income, that they had to go on assistance for food, and that she would work if she had the option. TR 329.

### C. Testimony of James Daly Dozier, Plaintiff's Husband

Plaintiff's husband, James Daly Dozier, also testified at Plaintiff's hearing. TR 329-334. The attorney asked Mr. Dozier to describe Plaintiff's interaction with their children prior to her January 2002 injury. TR 330. Mr. Dozier stated that Plaintiff had taken care of them, ridden bicycles and played ball with them, and "did everything for them." *Id.* The attorney asked how

26

Plaintiff used to take care of the home, and Mr. Dozier answered that she was "fantastic." *Id.*
He stated that she "did laundry, dishes, cooked, even cut the grass." *Id.* The attorney asked
about Plaintiff's leisure activities prior to the injury, and Mr. Dozier stated that he and Plaintiff
used to go to the river and jet ski, ski, or boat, but that "she can't do that anymore." *Id.* He
further stated that "the children take care of her now" and that he and the children did the
housework. TR 331. He added that Plaintiff could no longer play with the children or drive
them places, and that the children had to do chores instead of playing with their friends. *Id.* Mr.
Dozier also stated that he had sold the jet skis "partially due to lack of use and also need of
money." TR 332.

The attorney asked about Plaintiff's sleep habits. TR 332. Mr. Dozier testified that
Plaintiff got "uncomfortable, stiff and sore" in bed and could only sleep 3 or 4 hours before
getting up. *Id.* Mr. Dozier added that his own sleep was disturbed because of her getting up and
down, and his worry about her. TR 333. He stated that he made sure that she took her
medications. *Id.* He added that Amitriptyline and Neurontin made it "take a while for her to ...
register what's going on," that the pain medication upset her stomach "pretty bad," and that the
pill for nausea made her "kind of like a zombie all the time." *Id.* The attorney asked about the
effect of Plaintiff's condition on the "intimacy part of your marriage," and Mr. Dozier replied
that it had "taken a lot of that away." TR 334. The attorney then asked if Plaintiff had any
memory problems. *Id.* Mr. Dozier stated that she had "a real bad memory," and testified that
Plaintiff forgot things like medicine, the children's school work, phone messages, and past
conversations. *Id.* He further stated that he believed Neurontin caused the memory problems.
*Id.*

### D. Vocational Testimony

Vocational expert Gordon Doss, Ph.D., also testified at Plaintiff's hearing. TR 320-321, 335-338. Dr. Doss classified Plaintiff's past relevant work as a courier as medium and semiskilled, her past relevant work as a stock clerk as medium and semiskilled, her past relevant work as a cashier as light and semiskilled, and her past relevant work as a diesel mechanic as heavy and skilled. TR 321.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 335-336. The VE answered that the hypothetical claimant would not be able to perform any of Plaintiff's past relevant work. TR 336. The ALJ asked what positions this person could perform, and the VE stated that the person would be able to do some light and sedentary work. *Id.* The VE opined that, in the state of Tennessee, there would be approximately 1,635 unskilled sedentary general office clerk positions, 7,847 unskilled light general office clerk positions, 1,047 unskilled light counter clerk positions, 1,698 unskilled sedentary receptionist positions, 1,273 unskilled light receptionist positions, and 1,698 unskilled sedentary information clerk positions, all of which would be appropriate for the hypothetical claimant. TR 336-337. The VE testified that, in addition to the enumerated available positions, there would also be other positions of the same nature that would be appropriate for the hypothetical claimant. *Id.*

The attorney then asked the VE what jobs would be available for a person with a GAF of 48 (instead of the GAF of 58 in the ALJ's hypothetical). TR 337. The VE testified that a person with a GAF of 48 would not be able to work at any job in a sustained basis. TR 338. The

attorney then asked the VE to consider a person with a GAF above 48 but below 58 and with some concentration, memory, and social interaction issues not included in the ALJ's hypothetical. *Id.* The VE testified that the higher above 51 a person's GAF was, the more complex the instructions and tasks the person could perform. *Id.* The VE classified a GAF of "51 to 54, 55" as "in the moderate range of psychological instruction." *Id.*

Plaintiff's attorney then asked the VE to consider the effect of a 6-hour sit-stand limitation rather than the 8-hour limitation proffered in the ALJ's hypothetical. TR 338. The VE testified that such a person would be limited to working on a part-time basis. *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

30

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[12] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the

---

[12]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

Case 3:05-cv-00323   Document 18   Filed 12/05/06   Page 31 of 37 PageID #: 108

claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that (1) the ALJ failed to identify conflicts between VE testimony and the D.O.T. under the requirements of SSR 00-4p, and (2) the ALJ's determination that Plaintiff did not have a severe mental impairment is not supported by substantial evidence. Docket Entry No. 16. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or, in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or
> reversing the decision of the Commissioner of Social Security,
> with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can

be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1. SSR 00-4p**

Plaintiff contends that the ALJ failed to comply with SSR 00-4p, because he did not "inquire as to potential conflicts between vocational expert evidence and the DOT." Docket Entry No. 16. Specifically, Plaintiff argues that it was improper for the ALJ to find that there were a significant number of jobs in the national economy that Plaintiff could perform because of inconsistencies between the DOT descriptions of jobs the VE listed as appropriate and Plaintiff's medically assessed physical limitations. *Id.*

As explained above, the Commissioner has the burden at step five of the sequential evaluation process of establishing the claimant's ability to work by proving the existence of a significant number of jobs in the national economy that the claimant could perform, given his or her age, experience, education, and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920. *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). The ALJ may rely on the testimony of a vocational expert in response to a hypothetical question as substantial evidence of the existence of a significant number of jobs that the claimant is capable of performing as long as the hypothetical question accurately represents the claimant's limitations. *See Varley*, 820 F.2d at 779 (*quoting O'Banner v. Secretary*, 587 F.2d 321, 323 (6th Cir. 1978)).

33

The ALJ's hypothetical question posed to the VE in the case at bar incorporated Plaintiff's exertional and nonexertional limitations, as well as Plaintiff's age, education, work experience, and postural limitations.[13] *See* TR 335-336. Because the ALJ's hypothetical question accurately represented Plaintiff's limitations, the ALJ properly relied on the VE's answer to the hypothetical question to prove the existence of a significant number of jobs in the national economy that Plaintiff could perform. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary*, 823 F.2d 922, 927-928 (6th Cir. 1987); and *Varley*, 820 F.2d at 779.

As Plaintiff correctly argues, SSR 00-4p states that the ALJ has an affirmative responsibility to ask about possible conflicts between the VE's evidence and information provided in the DOT. Docket Entry No. 16. Plaintiff argues that the ALJ's failure to do so requires remand because such conflicts exist. *Id.* Specifically, Plaintiff maintains that Dr. Hazelwood's determination that Plaintiff could only reach on an occasional basis precludes the availability of the general office clerk and receptionist positions identified by the VE as available because the DOT requires frequent reaching for those positions. *Id.* The Secretary, in its Response, does not dispute that Plaintiff would, in fact, be precluded from these positions. Docket Entry No. 17, p. 7. Thus, Plaintiff is correct in her assertion that the general office clerk and receptionist positions do not constitute jobs that she could perform.

Plaintiff also argues that ambiguity surrounds the availability of the identified counter clerk and counter clerk positions, as each of those positions has 2 DOT entries and the VE did

---

[13] Plaintiff states that the ALJ did not include Plaintiff's limitation of reaching in his decision, but the ALJ did include in his hypothetical the limitation that Plaintiff could "occasionally" reach. TR 17, 335.

34

not specify to which entry he was referring. Docket Entry No. 16. The Secretary does not

dispute that there is ambiguity with regard to the counter clerk position, as both definitions

describe jobs at the light level, but one definition requires frequent reaching, while the other

definition requires only occasional reaching. Docket Entry No. 17, p. 7. Thus, Plaintiff would

be precluded by one definition, but not the other, and it is unclear to which definition the VE was

referring. Accordingly, the counter clerk positions likewise cannot constitute jobs that Plaintiff

could perform.

With regard to the information clerk positions, however, the VE testified that there were

1,698 sedentary information clerk positions in the state of Tennessee that would be appropriate

for the hypothetical claimant. TR 337. Although there are 2 DOT entries regarding information

clerk positions, only one of those entries pertains to information clerk positions at the sedentary

level (DOT 237.367-022). Accordingly, there is no ambiguity surrounding the information clerk

position.

Moreover, the sedentary information clerk position only requires occasional reaching,

and is therefore consistent with the limitations imposed by Dr. Hazelwood, and is consistent with

the ALJ's hypothetical and RFC finding. Accordingly, even discounting the general office clerk,

receptionist, and counter clerk positions, the Secretary has satisfied its burden of demonstrating a

significant number of jobs that Plaintiff could perform because it has established the availability

of 1,698 information clerk positions. Plaintiff's argument, therefore, fails.

## 2. Substantial Evidence

Plaintiff also contends that the ALJ's conclusion that Plaintiff does not have a severe

psychiatric impairment and suffers no psychiatric limitations is not supported by substantial

evidence.  Docket Entry No. 16.

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." *See, e.g.,* TR 12-18.  The ALJ's decision includes a summary of Plaintiff's psychiatric evaluations by Dr. Pritchett on April 22, 2003, by Dr. Hebda on May 23, 2003, and by Dr. Pestrak on June 4, 2003.  *Id.*  The ALJ discounted Dr. Pritchett's assessment as internally inconsistent and unsupported by other objective medical evidence, but found Dr. Hebdra and Dr. Pestrak to be consistent in their determination that Plaintiff had only mild symptoms and was not significantly limited psychologically.  *Id.*  The ALJ also noted that Plaintiff's treating physician, Dr. Hazlewood, who prescribed Plaintiff's only mental health medication, Elavil, consistently reported that her mood and affect were normal and that her memory loss was not significant.  *Id.*

Additionally, the ALJ's decision demonstrates that he carefully considered Plaintiff's testimony, finding that her subjective assessment of her mental state conflicted with the doctors' assessments.  *Id.*  While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff did not suffer from a severe mental impairment.  *Id.*

36

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

Case 3:05-cv-00323   Document 18   Filed 12/05/06   Page 37 of 37 PageID #: 114